**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JEANNINE SWARTZLANDER,

      Plaintiff,

                              Case No. C2-07-022
vs.                        Judge Edmund A. Sargus, Jr.
                              Magistrate Judge Terence P. Kemp

THE LONGABERGER COMPANY,

      Defendant.

## OPINION AND ORDER

Plaintiff, Jeannine Swartzlander, a former employee of the Longaberger Company, alleges that, upon learning of her pregnancy and intention to take maternity leave, Longaberger retaliated against her in violation of the Family and Medical Leave Act and Ohio Revised Code § 4112.02(A). This matter is before the Court for consideration of the Motion for Summary Judgment filed by Defendant, the Longaberger Company. For the reasons that follow, the Motion is granted with respect to Plaintiff's claims under the Family and Medical Leave Act, and her supplemental state law claim is dismissed without prejudice.

### I.

Longaberger is a family-owned business founded in 1973 that produces handcrafted baskets and other products for the home. In 2000, Longaberger employed 8,200 people. Due to a falling demand for its baskets, Longaberger's chief product, the company now employs 2,800 people. In addition to numerous layoffs and job eliminations that Longaberger has experienced since 2001, the

company has reorganized departments and restructured jobs.  In 2005, Longaberger laid off 449 employees; 66 were administrative positions.  In the information technology department, Longaberger eliminated 20 positions in 2005. In 2006, the company eliminated 11 positions.

Plaintiff began working for Longaberger on June 24, 2002.  She began her employment as a help desk leader when she was four months pregnant.  Longaberger voluntarily provided Plaintiff the eight (8) week maternity leave provided under the Family and Medical Leave Act, despite her ineligibility for time off under the statute.[1]

Longaberger promoted Plaintiff twice, first to help desk manager and, following a corporate reorganization, to information technology manager ("I.T. Manager") in December 2003.  As an I.T. Manager, Plaintiff supervised three work groups within the information technology department.  In particular, Plaintiff managed the End User Support ("EUS") team, which was responsible for supporting Longaberger's special events and providing daily technology support to Longaberger's employees.

Plaintiff reported to George Haller, Director of Technology, until January of 2006.  In her 2005 performance evaluation, which Mr. Haller completed, Plaintiff's overall performance was rated as "meets expectations", which is a middle range assessment of her work.  (Pl's Dep., Exh. 3.)  Mr. Haller noted some areas in which Plaintiff could improve, including that she "needs to be more effective at managing her personal tasks; there have been several occasions over the past year that assigned requests have [been] delivered late and only after a reminder.  In the general scheme of her

---

[1]     Plaintiff was not eligible for leave under the FMLA because she had not worked long enough for Longaberger.  Generally, an employee is eligible for FMLA leave if the employee has been employed for at least 12 months by the employer from whom leave is requested and for at least 1,250 hours of service with that employer during the previous 12–month period.  29 U.S.C. § 2611(2)(A)(i) & (ii).

role, this is not a large issue, [*sic*] however it is something that should be an area of focus in the future . . . ." (Pl's Dep., Exh. 3.) He also noted that she could "lose her perspective on a situation and let her emotions guide her actions and decisions . . . ." (*Id.*) The performance evaluation contained objectives for Plaintiff to achieve in 2006, which included goals to "[s]upport Company events such as Bee, Buzz, Employee Sales and Web casts," and to "[a]ssit in preparation and execution of events." (Pl's Dep., Exh. 3.)

Plaintiff began reporting to Jeff Baxter, Network Support Manager, in January 2006. Three months after she began reporting to Mr. Baxter, Plaintiff's work group was responsible for providing technical support for a special event known as the Collector's Club. On the day of the event, Plaintiff communicated with Brian Briggs, a subordinate technician who was on site at the Collector's Club, to determine whether any information technology issues required her personal attention. Although she told Mr. Briggs that she would go to the venue if the need arose, she did not contact or otherwise discuss the matter with her supervisor, Mr. Baxter. Mr. Baxter approached Plaintiff the following work day and expressed his disappointment that she had not personally attended the event. (Pl.'s Dep., at 50-51.)

Mr. Baxter completed a mid-year performance review of Plaintiff in June of 2006. He identified several areas in which Plaintiff required improvement, including that she should "[c]ommit to do what you say when you say it." (Pl's Dep., Exh. 4.) Mr. Baxter identified several instances in which Plaintiff's work was late or she had changed her schedule. Mr. Baxter also noted that Plaintiff frequently took unscheduled time off work and could improve her ability to execute requests, again noting several instances in which Plaintiff failed to complete work assignments. Mr. Baxter also indicated in Plaintiff's mid-year performance review that Plaintiff could improve her

-3-

ability to receive feedback and constructive criticism, noting that she had become very emotional following her annual review in February and took time off work. Ultimately, Mr. Baxter indicated that Plaintiff's overall performance met expectations. Plaintiff disagreed with the review, and refused to sign it.

After this mid-year performance review, Plaintiff learned that she was pregnant. She immediately told her family, co-workers, and her new supervisor, Lisa Hittle. This announcement came shortly before the Longaberger Bee, the company's largest off-site event that occurred annually, and, that year, on July 26, 2006.

On July 26, 2006, Plaintiff was scheduled to work the Longaberger Bee as a cashier from 4:30 P.M. until 9:30 P.M. On that date, the EUS team needed additional equipment, including two printers and a cell phone. Ms. Hittle asked Plaintiff to bring the equipment when she came to the Bee. Plaintiff, however, did not attend the Bee because her son was ill. Plaintiff contacted the "Bee Captain," Amy Wolford, who was the Longaberger employee responsible for cash registers, approximately 30 minutes before she was scheduled to begin to give notice that she was unable to work that evening.[2] Plaintiff did not inform Ms. Hittle of her absence, despite her supervisor's request that she bring equipment to the special event.[3]

---

[2]     Plaintiff indicated in her deposition that she new as early as the night before and throughout the morning that her son was ill, because she had been up with him all night as he was sick. She did not, however, notify anyone at the Bee that she could not attend until shortly before her scheduled time to arrive.

[3]     Ms. Hittle indicates that, when she learned that Plaintiff was not at the Bee, she left a voicemail message on Plaintiff's mobile phone, and a message with Plaintiff's step-daughter at her residence. Plaintiff testified at her deposition that she did not receive the message on her voicemail until much later at night, and that she never received a message from her step-daughter that Ms. Hittle had called.

That same day, Plaintiff left the printers, valued at approximately $1500, unattended on a loading dock near the venue of the Longaberger Bee. She telephoned members of her team and directed them to come to the loading dock to pick up the equipment, and then drove away with her sick son in the car, leaving the equipment unattended. When her team members attempted to collect the printers, they could not locate them on any of the several docks located behind the building complex. The equipment was not located until the next day, because security officers at the loading dock had found them, and, not knowing what to do with the printers, had locked them in a security office. Plaintiff asserts that the whole situation was a mutual misunderstanding, for which she was not accountable, and thought that her team members were at fault for failing to communicate better with her. She also contends that, other than July 26, 2006, she completed the rest of the shifts for which she had volunteered during the eleven-day Bee event.

Longaberger's workplace policies provide that an employee generally receives a verbal warning or first level disciplinary action followed by a written warning or second level warning prior to termination of employment. (Delligatti Aff., at ¶ 3, Exh A, pp. 28-30.) Perceiving that Plaintiff had failed to perform her job duties at the Bee, Plaintiff's supervisor, Ms. Hittle, initiated disciplinary action against Plaintiff. When Ms. Hittle requested that Plaintiff come to the corporate headquarters to discuss the matter in person, Plaintiff responded in an email that it was "a bit irritating" for her to have travel to the office to meet with Ms. Hittle in the morning when she was working at the Bee later that day. (Pl's Dep., Exh. 9.) Plaintiff ultimately met Ms. Hittle on August 1, 2006, and received a Standards of Conduct Violation Notice for inattention to her job duties at the Bee and her disrespectful attitude in her emails. (Pl's Dep., at 94-95, Exh. 10.) Ms. Hittle indicated on the Standards of Conduct Violation Notice:

> I do understand that Jeannine had a sick son, however, if she would have let me know, I could have found someone to fill in for her so that they would not have been short. If all cashiers would have called off 1 hour before the store opened, the company would have not been in a good position to entertain the Consultants.
>
> This type of behavior is unacceptable. Jeannine is a manager and with her not showing up to large event does not set a good example for her employees. This is not the first time this has happened. Jeannine did not show up for support at the Collector's Club event in April. . . .[4]

(Pl's Dep., Exh. 10.) Ms. Hittle cautioned that "if this type of behavior continues, I will have to remove [Plaintiff] from [her] manager position." (*Id.*) Later that same day, Plaintiff indicated in an email to Ms. Hittle: "I know that I have made some mistakes and have not handled some 'feelings' in the most appropriate manner. I apologize that I have not been meeting expectations and know that some things must change." (Pl's Dep., at p. 102, Exh. 11.)

Plaintiff does not contend that her August 1, 2006 warning had anything to do with her pregnancy. Plaintiff stated that she "believes it had to do with [her] absence and lack of communication regarding [her] cashier duties." (Pl's Dep., at p.127.)

On the same day she received her reprimand, August 1, 2006, Plaintiff telephoned Longaberger's third-party administrator and filed a claim for intermittent leave under the Family and Medical Leave Act ("FMLA"). At the time she filed for FMLA benefits, Plaintiff had no medical reason necessitating leave and did not suffer from any complications related to her pregnancy. Moreover, Plaintiff was never required to deduct time off for routine doctor visits. Plaintiff applied for intermittent leave only to preserve her right should the need arise. Plaintiff testified that she applied for FMLA leave after she received this first-level discipline warning only to "cover" herself

---

[4]     Plaintiff points out that this event had not merited mention on her mid-year review by Baxter.

-6-

as a precautionary measure. (Pl's Dep., at p. 133.)

Longaberger denied her request for leave on August 30, 2006 because Longaberger's third-party administrator did not receive a medical certification indicating an appropriate need for FMLA absences. Plaintiff contacted Longaberger's human resources department regarding the denial, and learned of the process by which she could reapply for intermittent leave reconsidered. Plaintiff decided to wait until the need for leave actually arose before reapplying, and chose not to pursue reconsideration of the denial.[5] Longaberger never denied Plaintiff time off and did not require Plaintiff to use paid time off for doctor's appointments. (Pl's Dep., at pp. 112, 117, 134.) Plaintiff informed her supervisor, Ms. Hittle, on or about September 30, 2006 of her intention to take eight weeks off following the birth of her child.

Plaintiff alleges that her managers began excluding her from meetings that other mid-level managers at Longaberger had the opportunity to attend. For instance, according to Plaintiff, she was excluded from meetings related to the implementation of the new computer operating software, Microsoft Windows XP, although she was in charge of the transition, and she was not invited to bi-monthly management meetings.

On Friday and Saturday, November 3-4, 2006, Plaintiff's team was responsible for equipment sold at the Employee Sale. Plaintiff testified at her deposition that "the expectation was that [she] was going to be there, which, again, [she] communicated via an e-mail and [she] communicated through [her] team meetings[.]" (Pl's Dep., at 164.) Plaintiff did not inform her supervisor prior to the day of the sale that she did not intend to come to the site. She left Ms. Hittle a telephone message several hours after the sale started indicating that she had not left for the sale because her

---

[5]     Plaintiff gave birth to her daughter on March 23, 2007. (Pl. Dep., at pp. 113-14.)

husband had not returned from hunting.[6] Approximately two hours later, Plaintiff left Ms. Hittle a second message stating that she had decided not to go to the sale because her husband just returned home and her team members who were at the site reported that the sale was slow.

Longaberger employees who attended the Sale testified that it was very busy, and that the working stations were not adequately covered. One member of Plaintiff's team, Steve Veyon, whom she had scheduled to staff the Employee Sale, was on-call for other technical emergencies throughout the Longaberger building complexes. Another member of Plaintiff's team was shopping at the sale, not working, and volunteered to help sell equipment when Mr. Veyon was called away. Later in the day, Ms. Hittle had to fill-in when Mr. Veyon again had to respond to another call. Mr. Veyon was frustrated because Plaintiff, his supervisor, "told [him] she would be there." (Veyon Dep., at 15.) From Plaintiff's perspective, however, attendance at the special event was wholly voluntary.

On November 4, 2006, Ms. Hittle issued Plaintiff a second-level warning, and thereafter created a new, non-management position for her, as Senior Project Coordinator. As set forth in the Notice and follow-up documentation, Ms. Hittle cited Plaintiff again for neglecting her management duties, and indicated Plaintiff had been "lacking in her leadership skills, fail[ing] to follow through on her commitments, not showing support for the company events (attendance), and showing poor communication skills when she did not show up for the Employee Sale on November 4th that she had scheduled with her manager and staff members." (Pl's Dep., Exh. 24.)

---

[6]     The record also indicates that Plaintiff knew on Tuesday night of the week prior to the Employee Sale that her husband was going hunting, and that she could not volunteer there. Plaintiff never told her supervisor that she was not going to be at the Employee Sale the entire day. (Pl's Dep. II, at pp. 16-17.)

The Senior Project Coordinator position was a demotion for Plaintiff. The salary for this position was $48,300 annually. As a manager, Plaintiff earned $62,566.40, or $14,256 more than the salary offered to her as Senior Project Coordinator. Plaintiff chose to resign instead of taking the demotion.

Longaberger never replaced Plaintiff's manager position. Instead, Ms. Hittle assumed Plaintiff's former management responsibilities.

Plaintiff filed a Complaint in this Court invoking federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff alleges in Count One that Longaberger violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by using a proposed FMLA-protected absence as a negative factor that led, at least in part, to her demotion. Plaintiff also alleges that Longaberger treated her in a discriminatory fashion due to her need for FMLA-protected leave, including, according to Plaintiff, "seizing onto pretextual claims against Plaintiff to try to justify demotion and discharge." (Complaint, ¶ 19.) In Count Two, Plaintiff alleges that Longaberger discriminated against her on the basis of her gender, and in particular, her pregnancy, in violation of Ohio Revised Code § 4112.01 *et seq.*, a state-law claim over which this Court supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## II.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## III.

**A.     Family and Medical Leave Act**

Defendant-Longaberger moves for summary judgment with respect to Plaintiff's claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. The FMLA entitles eligible employees to a leave of absence "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter," or for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(A) & (D). A "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves continuing treatment by a health care provider. 29 C.F.R. § 825.114(a)(2). A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

> (i)     A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
>> (A)     Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>>
>> (B)     Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.
>>                     * * * *
>
> (ii)     Any period of incapacity due to pregnancy, or for prenatal care.

29 C.F.R. § 825.114(a)(2)(i)(A) & (B), (ii). Moreover, under the FMLA, it is "unlawful for any

-11-

employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1). An employer is required to grant leave to eligible employees when a serious health condition "makes the employee unable to perform the functions of the employee's job." 29 C.F.R. § 825.112(a)(4).

The Sixth Circuit recognizes "two distinct theories of recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising under 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Entitlement/interference claims are based on "prescriptive" rights, which establish "'entitlements' to employees and 'set floors for employer conduct,'" while retaliation claims are based on "proscriptive" rights, which "prohibit disparate employer conduct with regard to employees taking leave." *Taylor v. The Union Institute*, 30 Fed.Appx. 443, 452 (6th Cir. 2002) (unpublished)(quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)).

### 1.     Interference

To prevail on an interference claim under the FMLA, Plaintiff must prove: (1) she was an FMLA "eligible employee"; (2) the defendant is an FMLA "employer"; (3) she was entitled to FMLA leave; (4) she gave the employer notice of the intention to take leave, and; (5) the employer denied her FMLA benefits to which she was entitled. *Cavin v. Honda of Am., Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

Defendant moves for summary judgment on any claim Plaintiff may have for interference with her rights under the FMLA because Plaintiff was never denied FMLA benefits. Indeed, Plaintiff testified that she was not denied any leave based on her pregnancy, and was never denied

-12-

FMLA benefits.

Defendant's Motion for Summary Judgment as to Plaintiff's interference claim, to the extent she sought to assert one, is granted. Plaintiff does not allege, nor does the record reflect, that Longaberger discouraged Plaintiff from taking her leave, or set any conditions in return for granting Plaintiff's request for leave. Here, the record is undisputed that Longaberger never denied Plaintiff time off during her pregnancy. Plaintiff did not pursue her request for intermittent leave after she was notified by Longaberger's third-party administrator that it had not received a medical certification. Further, Plaintiff admits that she did not need intermittent leave in August 2006 when she requested it, and had no medical reason for FMLA time off. Longaberger, therefore, is entitled to summary judgment on Plaintiff's claim of interference with her FMLA rights, to the extent she intended to assert it, because it did not deny her this benefit.

### 2.    Retaliation

Plaintiff primarily asserts that Longaberger demoted her in retaliation for notifying her supervisor that she expected to take maternity leave six months later. "The right to actually take twelve weeks of leave pursuant to the FMLA includes the right to declare an intention to take such leave in the future. *See* 29 U.S.C. § 2612(e) (requiring an employee to give his employer notice of "foreseeable leave" in order to come under the protection of the statute)." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

In an FMLA case relying upon indirect evidence, as is the case here, the Court applies the three-step process delineated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to assess Plaintiff's claim that she was demoted in violation of the FMLA for providing notice of her intention to take maternity leave. Under the *McDonnell Douglas* framework, Plaintiff must first prove a *prima*

-13-

*facie* case of discrimination. Plaintiff can demonstrate a *prima facie* case of retaliation by showing that (1) she availed herself of a protected right under the FMLA by notifying Longaberger of her intent to take leave, (2) she suffered an adverse employment action, and (3) a causal connection exists between the exercise of her rights under the FMLA and the adverse employment action. *Skrjanc*, 272 F.3d at 314. If Plaintiff makes out a *prima facie* case, the burden then shifts to Longaberger to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the Longaberger does so, Plaintiff has the burden of showing that the articulated reason is in reality a pretext to mask discrimination. *Id.* at 314-15; *see also Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

The parties do not dispute matters related to the first two elements of the *prima facie* case. The parties disagree, however, as to whether Plaintiff's notification of her intent to exercise her FMLA rights is causally connected to the demotion. Longaberger maintains that Plaintiff cannot establish a *prima facie* case of discrimination because she cannot demonstrate a causal connection between her FMLA request and the elimination of her management responsibilities.

As proof of retaliation, Plaintiff relies heavily on the proximity in time between her request for future leave and her demotion. Proof of temporal proximity between the protected activity and the adverse employment action, however, must be "coupled with other indicia of retaliatory conduct," to give rise to a finding of a causal connection. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection.")

-14-

Plaintiff notes that on September 30, 2006, she notified her supervisor, Ms. Hittle, that she planned to take maternity leave six months later. She emphasizes that less than five weeks later, on November 4, 2006, she was demoted. Plaintiff's notification of her intention to take maternity leave, however, came after she received two disappointing performance reviews, verbal counseling after she failed to attend the Collector's Club, and a documented verbal counseling after she neglected her management duties at the Bee. Plaintiff requested leave two months after Ms. Hittle warned Plaintiff, in writing, that if her performance was not corrected, she would be relieved of her management duties. Plaintiff acknowledged on August 1, 2006, a month before she notified her supervisor, that she was not meeting expectations. (Pl. Dep., Exh. 11.) On that same day, Plaintiff admits that she attempted to use the FMLA to "cover" herself after she received this discipline warning.

Plaintiff has failed to adduce evidence tending to show additional indicia of retaliatory conduct. Without such supplemental evidence, the temporal proximity between her September 2006 notification of her intention to take maternity leave and the decision in November 2006 to demote her to a non-management position is insufficient to demonstrate a causal connection. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000) (temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence); *Nguyen v. City of Cleveland*, 229 F.3d 559, 565 (6th Cir. 2000) (rejecting the plaintiff's argument that "temporal proximity between the protected activity and the alleged discriminatory act is alone sufficient to establish a causal connection").

Even if Plaintiff could establish a *prima facie* case of retaliation, Longaberger has articulated a legitimate nondiscriminatory reason for eliminating her management duties. Ms. Hittle initiated

-15-

the demotion because, in her view, Plaintiff lacked leadership skills, failed to follow through on commitments, and failed to support and manage key-company events. Plaintiff, however, has not established that these reasons are a pretext for FMLA retaliation.

A plaintiff can refute an employer's proffered legitimate, nondiscriminatory reason for an adverse employment action by showing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Here, Plaintiff maintains that Longaberger's proffered rationale for her demotion, namely neglect of management duties, is a pretext for retaliation because Longaberger changed its reasons for the demotion and skipped steps under its progressive discipline policy.

The record here contains no evidence to support Plaintiff's contention that Longaberger changed its reason for Plaintiff's demotion. Plaintiff cites *Asmo v. Keane*, 471 F.3d 588 (6th Cir. 2006) as support for her assertion that an employer's changing rationale for an adverse employment decision may provide evidence of pretext. In *Asmo*, the court found that the employer eliminated two of its original five reasons for terminating the plaintiff's employment after the litigation commenced and one of the reasons was factually false. Here, Longaberger's reason has remained consistent throughout the course of the underlying events giving rise to Plaintiff's claims and throughout this litigation, namely Plaintiff's neglect of her management duties.

Plaintiff points to the Standards of Conduct form related to the second level warning and demotion arguing that the form did not "mention the original reason that Hittle gave for the first written warning, *i.e.*, not personally handing off the printers." Plaintiff also contends that Longaberger has manufactured a new rationale for the demotion, specifically that Plaintiff's job was

-16-

eliminated. (Pl's Mem. in Opp., at 13.) These contentions, however, disregard the language on the form that references Plaintiff's August 1, 2006 warning, which included the complaint that Plaintiff abandoned the equipment. (Pl. Dep., Exhs. 23, 24.) This form also specifically states that the "[t]he Manager of EUS position is being eliminated[.]" (Pl. Ex. 24) Consequently, the evidence fails to support Plaintiff's suggestion that Longaberger has changed its rationale for Plaintiff's demotion.

Similarly, Plaintiff's contention that Longaberger skipped steps and applied its disciplinary policy in an unduly harsh manner is not supported by the record. Longaberger's progressive discipline policy provides for flexible treatment of employees based on the circumstances. Specifically, Longaberger's Standards of Conduct policy provides that, "[i]n enforcing Standards of Conduct guidelines, The Longaberger Company may decide to use a lesser penalty when there are extenuating circumstances, or a more severe penalty when the violation is an aggravated one." (Delligatti Aff., ¶ 31, Exh. A at 27, 29-30.) Thus, while Longaberger's progressive disciplinary policy provides for three disciplinary levels, the third level being discharge of employment, the policy also permits a flexible application depending on the offense. (Delligatti Aff., at ¶ 13.)

Longaberger never issued a third-level discipline of discharge to Plaintiff. Instead, Plaintiff received a verbal warning, another verbal warning, and a written second-level disciplinary warning and demotion after her supervisors determined that she neglected her management duties at a three special events in an eight-month period. Although Longaberger retained the discretion to discharge Plaintiff, it instead offered her a demotion so that she could remain employed. These facts undercut Plaintiff's assertion of pretext.

In this case, Plaintiff exercised her rights under the FMLA by providing notification of her anticipated requirement for maternity leave at least six months in advance of when she would need

-17-

it. The issue thus becomes whether Plaintiff may unilaterally place herself in a protected class in this manner, and whether the evidence supports a finding that her former employer retaliated against her on that basis. For the foregoing reasons, the Court concludes that the evidence does not support such a finding.

**B.      State Law Claims under Ohio Revised Code § 4112.01**

Plaintiff also sued Longaberger for pregnancy discrimination under the Ohio Revised Code.[7] Case law in the Sixth Circuit is well-settled that where federal claims are dismissed prior to trial, supplemental state law claims should also normally be dismissed. *See Musson Theatrical, Inc. V. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996); *see also Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.") (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Because the Court disposes of Plaintiff's federal claims by this Order, the Court declines to exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(c)(3). Consequently, Plaintiff's state law claims are dismissed without prejudice. *Gibbs*, 383 U.S. at 726;

---

[7]      Although pregnancy discrimination claims brought under Ohio Revised Code § 4112.01 are analyzed using the same rationale as pregnancy discrimination claims under Title VII, Plaintiff has no brought no independent federal cause of action on this basis. Resolution of Count II of the Complaint will rest exclusively upon decisions of state law. The state courts of Ohio are the proper forum for the interpretation, refinement and application of that state's statutory and common law principles. Moreover, the Supreme Court in *Gibbs* counseled that federal courts should avoid needless participation in those processes as a matter of comity. *Gibbs*, 383 U.S. at 726-27 ("Federal courts should avoid making decisions of state law when few or no federal issues remain, and no affirmative need for federal jurisdiction exists.").

-18-

*Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001).

## IV.

Defendant's Motion for Summary Judgment (Doc. #19) is **GRANTED** as to Plaintiff's federal claims under the FMLA. Plaintiff's state-law claim under Ohio Revised Code § 4112.01 is **DISMISSED WITHOUT PREJUDICE.** The Clerk is directed to enter judgment in favor of Defendant, and to remove this case from the Court's pending cases and motions list.

**IT IS SO ORDERED.**

_____6 - 6 - 2008_____
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**